**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**CAROLINA COMPANY, Inc., and Jack Hicks, Defendants.**

**No. C–129–R–64.**

United States District Court
M. D. North Carolina,
Rockingham Division.

June 24, 1966.

Charles Donahue, Sol., Beverley R. Worrell, Regional Attorney, Daniel M. Williams, Jr., Attorney, and James H. Woodson, Attorney, United States Department of Labor, Atlanta, Ga., for plaintiff.

William D. Sabiston, Jr., Carthage, N. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff, W. Willard Wirtz, Secretary of Labor, United States Department of Labor, brings this action to restrain the defendants, Carolina Company, Inc., and Jack Hicks, from violating certain provisions of the Fair Labor Standards Act of 1838, as amended, 29 U.S.C. § 201, et seq., and from withholding payment of minimum wages and overtime compensation alleged to be due certain employees.

The parties stipulated that the first phase of the trial would be limited to the following issues:

(a) Have the defendants violated Section 6 of the Act by failing to pay some of their employees the applicable minimum wage as required by Section 6 of the Act (29 U.S.C. § 206)?

(b) Have the defendants violated Section 7 of the Act by failing to pay some of their employees at a rate not less than one and one-half times their regular rate for hours worked over forty (40) per week, as required by Section 7 of the Act (29 U.S.C. § 207)?

(c) Have the defendants violated Section 11(c) of the Act (29 U.S.C. § 211 (c)) and Regulations 516, issued pursu-

ant to the authority contained therein and published in 29 C.F.R. 516, by failing to make, keep and preserve accurate records of hours worked per day and per week by some of their employees?

(d) Is plaintiff entitled to the injunction as demanded in the complaint?

(e) How much money, if any, is due the employees of the defendants named in the complaint, for the period set forth in the complaint, who are called as witnesses by either the plaintiff or the defendants to testify at the trial, by reason of the failure of the defendants to comply with Sections 6 and 7 of the Act (29 U.S.C. §§ 206 and 207)?

The case was tried by the Court without a jury. Proposed findings of fact, conclusions of law, and briefs of the parties having been received, the Court, after considering the pleadings and evidence, and briefs and requests of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

## FINDINGS OF FACT

1. The plaintiff brings this action to restrain defendants from violating Sections 6, 7, 11(c), 15(a) (1), 15(a) (2), and 15(a) (5) of the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201, et seq., (hereinafter referred to as the Act) and from withholding minimum wages and overtime compensation to certain of their employees under the Act.

2. Jurisdiction is conferred upon the Court by Section 17 of the Act, and it is stipulated that the Court has jurisdiction of the parties and of the subject matter herein.

3. The defendant, Carolina Company, Inc., is, and at all times pertinent was, a corporation organized and existing under and by virtue of the laws of the State of North Carolina, having a place of business at Southern Pines, Moore County, North Carolina, within the jurisdiction of this court. Said defendant is, and at all times pertinent was, en-

gaged in manufacturing soap, candles, and toilet preparations.

4. The defendant, Jack Hicks, is a citizen and resident of Southern Pines, North Carolina, within the jurisdiction of this court, and is president of the defendant corporation, Carolina Company, Inc., and actively manages, supervises and directs the business of said corporation in relation to its employees. Thus, said defendant is, and at all times pertinent was, an employer of said employees within the meaning of the Act.

5. At all times pertinent, the defendants employed numerous individuals in and about their place of business in Southern Pines, North Carolina, in connection with the ordering and receiving of goods, substantial quantities of which were shipped and delivered to the defendants' place of business from other states, and in connection with the production, sale and distribution of soap, candles, and toilet preparations, substantial quantities of which were regularly shipped by the defendants from their place of business to other states. Thus, employees of the defendants were engaged in commerce or in the production of goods for commerce within the meaning of the Act.

6. Beginning in 1956, the defendants, because of the growth of their business, commenced using homeworkers, in addition to regular plant employees, in the production of their products. The homeworkers were usually wives of plant employees. The number of homeworkers steadily increased from year to year. The products produced by homeworkers included such items as Regular Washballs, Guest Washballs, Shower Balls, Mini Balls, Soak N Rinse Envelopes, Sachet Envelopes, Cake Sachet, Guest Cakes, Wicks, CB-2 and Cath-wicks, and Fruit (soap items resembling bananas, pears, strawberries, peaches, apples, etc.).

7. To perform their work for the defendants, the only equipment needed by the homeworkers was a wooden, clamp-type mold. The molds were purchased from the corporate defendant, with the understanding that they would be repurchased at any time within a year after the homeworkers terminated their employment with the said defendant. The molds were used to mash the soap into its basic shapes.

8. The homeworkers performed the work in their living rooms, kitchens, bedrooms, and other convenient parts of their homes. Most of them were greatly assisted in their work by their husbands and children. The work was extremely routine and repetitive. It was the type of work generally performed, or capable of being performed, on an assembly line of an ordinary plant.

9. At the outset of their dealings with the various homeworkers, the defendants instructed the homeworkers generally as to how the work was to be accomplished and set the price per item of finished merchandise. The price per item varied widely, depending on the type and size of the finished merchandise.

10. Prior to August 29, 1963, the homeworkers were advised by the defendants that the homeworkers were "individual contractors," and as such, the defendants would not have, and did not seek to have, any control whatever over the hours worked by the homeworkers. It was provided, however, that the homeworkers would have to maintain certain specified production minimums, which had been worked out in the defendants' plant. For example, each homeworker was required to produce a minimum of sixty Regular Washballs per hour.

11. On August 27, 1963, the defendants advised the homeworkers that, commencing on August 29, 1963, there would be a change in pay schedules for homeworkers. The notice provided that the homeworkers would be paid at the rate of $1.25 per hour, rather than a piece-rate basis, "provided minimum production rates [were] met." The homeworkers were further advised that they must produce at the minimum rates in order to be paid on the hourly basis. Regular Washballs were required to be produced at the rate of 90 per hour, Regular Guest Washballs at the rate of 90 per hour,

Small Guest Washballs at the rate of 100 per hour, Shower Balls at the rate of 35 per hour, Mini Balls at the rate of 460 per hour, Soak N Rinse Envelopes at the rate of 300 per hour, Sachet Envelopes at the rate of 310 per hour, Cake Sachet at the rate of 132 per hour, Guest Cakes at the rate of 210 per hour, Fruit at the rate of 40 per hour, Wicks at the rate of 460 per hour, etc.

12. The defendants delegated to the homeworkers the responsibility of keeping their own time, and furnished them with approved handbooks for that purpose. The handbooks contained detailed instructions as to how time should be kept and recorded. A few of the homeworkers were given instructions as to how to keep their time by office personnel of the corporate defendant, but most of them were advised in this regard by their husbands or neighbors.

13. As a result of the instructions contained in the notice of August 27, 1963, and the almost total lack of supervision of the homeworkers, the change from a piece-rate basis to an hourly basis was more theoretical than real. Most of the homeworkers understood that for them to retain their employment their recorded hours must conform to the production schedule. For example, if two hours were required to produce 60 Regular Washballs, this time was actually recorded as one hour since the production schedule required the production of 60 Regular Washballs per hour.

14. Most of the homeworkers who testified at the trial never even attempted to keep a proper record of the number of hours worked. They usually worked at their own pleasure and convenience, and at irregular times. Members of the family assisted from time to time, and no record was kept with respect to either their time or production. Although the defendants furnished the homeworkers with adequate forms for maintaining accurate records, the forms seldom reflected accurate information with respect to hours actually worked or the hourly rate of pay. The entries consisted of nothing more than rough calculations made by the homeworkers, always having in mind the requirement of meeting minimum production requirements. As a result, the records maintained by the homeworkers, which are the only records ever kept, are so inadequate and incomplete that they bear little resemblance to the hours actually spent by the homeworkers in performing duties for the defendants.

15. In fixing the production schedules for homeworkers, the defendants took into consideration average productions by plant employees over a period of time.

16. During the period in question, the defendants were investigated by the Department of Labor on at least three occasions. During each visit, the Investigators informed the defendants as to the requirements placed upon them by the Act to keep accurate and complete records with respect to hours of work and rate of pay for each employee.

17. The employees accepted their work, week after week, without protest, knowing that they were not being fully compensated, and failed to make any complaint to the defendants of the fact that they were having to work overtime to meet production schedules.

18. There is no evidence that the defendants instructed the homeworkers to keep inadequate or incorrect records. However, the defendants made no effort, through supervision or otherwise, to determine if accurate records were being maintained.

19. By requiring production schedules to be met as a condition of employment, the defendants should have reasonably anticipated that the homeworkers would make their hours conform to production.

20. After a third investigation by the Department of Labor had been completed, and prior to the institution of this action, the defendants moved all the homeworkers into their plant, and they no longer use homeworkers in carrying on their business.

21. Helen Frye was a homeworker for the defendants from January 26, 1963, through May 6, 1964. During the period of her employment she made Regular

Washballs, Shower Balls, Guest Washballs, and Mini Balls. She testified that during the early part of her employment she timed herself for two hours, working alone, making Regular Washballs, and that during this two-hour period her production was 105, or an average of 52½ per hour. She had no idea how many Shower Balls and Guest Washballs or Mini Balls she was able to produce an hour. Her husband and 13-year-old daughter frequently helped her, but she had no idea as to the extent their help increased her production. She further testified that no matter how many Soap Balls she made during a week, she reported 40 hours per week and earnings of $46.00, and held the balance back. Although she estimated that she occasionally worked more than 40 hours per week she had no independent recollection concerning this. Under all the testimony, the Court finds, as a matter of just and reasonable inference, that this witness produced an average of 52½ Regular Washballs per hour during the period of her employment. With respect to Shower Balls, Guest Washballs and Mini Balls, the Court is unable to find, or even approximate as a matter of just and reasonable inference, the hourly production. Consequently, with respect to the production of these items, it is found that the witness was paid the minimum wage provided by the Act.

23. Nancy Kennedy did homework for the defendants from September 19, 1963, through March 24, 1964. Her production consisted of Regular Washballs and Shower Balls. She testified that if her husband was helping her, and they both worked "real fast," they could make from 18 to 20 Shower Balls per hour and about 90 Regular Washballs per hour. This production was determined from a test made shortly after she commenced working. She testified further, however, that the longer she worked the greater number she could produce per hour. The witness later testified that if she and her husband worked "just regular," their production would have been about 70 Regular Washballs per hour and about 15 Shower

Balls per hour. She had no idea as to what her production would have been working alone. Her husband was regularly employed in the defendants' plant. She never made any attempt to keep a record of the hours worked, but made her reported hours conform to the production schedule given her by the defendants. As a matter of just and reasonable inference from all the testimony, the Court finds that the witness, during the entire period of her employment, working alone, averaged producing 50 Regular Washballs per hour and 12 Shower Balls per hour.

24. Catherine Monroe (listed in the stipulations as Catherine Moore) was employed by the defendants as a homeworker from July 27, 1963, to November 15, 1963. During this period, she produced Regular Washballs, Guest Washballs and Shower Balls. She testified that with the help of her three children, she produced "about" 55 Guest Washballs, "around" 40 Regular Washballs, and "about" 14 Shower Balls, per hour. Without the help of her children, she testified that her production was "about" 40 Guest Washballs, 35 Regular Washballs, and 11 Shower Balls, or "something like that," per hour. She further testified that her children were of little assistance because they did not understand the operation. As a matter of just and reasonable inference, the Court finds that the witness, working alone, averaged producing 50 Guest Washballs, 38 Regular Washballs, and 12 Shower Balls per hour during the period of her employment. No record was kept of the actual hours worked, and the reported hours were made to conform to the production schedule furnished by the defendants.

25. Dorothy Threatt Holt (listed in the stipulations as Dorothy Threatt) was employed by the defendants as a homeworker from September 14, 1963, to March 6, 1964, during which period she produced Regular Washballs, Guest Washballs and Shower Balls. She testified that she timed herself to determine how many of the various items she could produce an hour. Working alone, she estimated that she could make from 30 to

40 Regular Washballs, 40 to 50 Guest Washballs, and 7 or 8 Shower Balls, per hour. As a matter of just and reasonable inference, the Court finds that the witness, working alone, averaged producing 40 Regular Washballs, 50 Guest Washballs, and 8 Shower Balls, per hour. The Court has taken the higher estimate because it is more in line with the average production of other homeworkers.

26. Priscilla Williams was employed by the defendants as a homeworker from March 4, 1963, to April 10, 1964. Her production consisted of Regular Washballs, Guest Washballs, Shower Balls and Fruit. She testified that she never timed herself to determine the number of the various items she could produce per hour, but estimated that, working alone, with soft soap, which was usually the case, she could produce from 45 to 50 Regular Washballs, about 60 Guest Washballs, approximately 15 Shower Balls, and about 40 Fruits, per hour. The 40 Fruits per hour meets the production schedule and the witness was paid a minimum wage for this work. With respect to the other items, the Court finds, as a matter of just and reasonable inference, that the witness, working alone, produced 50 Regular Washballs, 60 Guest Washballs, and 15 Shower Balls, per hour.

27. Elizabeth Harbeck was employed by the defendants as a homeworker from September 7, 1963, to April 10, 1964. During this period, she produced Fruits and Mini Balls. She testified that she timed herself, and that when working alone, with soft soap, she could produce from 25 to 30 Fruits and from 360 to 400 Mini Balls per hour. She further testified that her soap was soft about half the time, but when it was hard it did not take very long to warm it to the point it became soft. From all the evidence, as a matter of just and reasonable inference, the Court finds that the witness, working alone, averaged producing 25 Fruits and 360 Mini Balls per hour.

28. Peggy Ramey was employed by the defendants as a homeworker from April 13, 1963, through September 27, 1963. Her production consisted of Regular Washballs, Shower Balls, and Wicks. She never timed herself, but "guessed" her production of Regular Washballs was from 30 to 35 per hour. She had no opinion whatever with respect to her production of Shower Balls and Wicks. Since she never timed herself, and was testifying from recollection of the events that occurred almost three years before she appeared in court, and giving due consideration to the production of Regular Washballs by other homeworkers, and other relevant factors, the Court finds, as a matter of just and reasonable inference, that the witness produced an average of 40 Regular Washballs an hour. With reference to Shower Balls and Wicks, there is not a scintilla of evidence upon which the Court could even approximate her production. Consequently, it is found that the witness made her production schedule as to these items, and has been paid the minimum wage.

29. All of the aforementioned homeworkers, except Peggy Ramey, recorded their production and pay in their homeworkers' handbook, the original of which is in evidence. It is found that the entries in the handbook of each of the homeworkers correctly reflect the production and pay of each homeworker. In the event a handbook reflects the production of items not referred to in the aforementioned testimony of the homeworker, it is found that the homeworker made her production schedule in respect to such items and received the minimum wage.

30. As to Peggy Ramey, her homeworkers' handbook has apparently been lost. However, the defendants have compiled from their records a schedule showing her production and pay, week by week. It is found that this schedule correctly reflects the production and pay of the witness for the period involved.

31. None of the homeworkers even attempted to keep a record of the actual hours worked, and the hours reported in the various handbooks were made to conform to the production schedule furnished by the defendants.

32. The plaintiff failed to show the extent of hours worked over 40 hours per week by any of the seven employees who testified, as a matter of just and reasonable inference.

## DISCUSSION

■ The homeworkers employed by the defendants prior to September 3, 1963, under Section 6(a)(1) of that Act, were entitled to receive at least $1.15 per hour, and those employed thereafter were entitled to receive at least $1.25 per hour. There can be no question that all of the homeworkers who testified at the trial failed to receive, at least with respect to some of the items produced, the minimum wage. The recorded hours reflect nothing more than the result of dividing production requirements by actual production, rather than the actual number of hours worked. It follows that the defendants have clearly violated Section 6 of the Act by failing to pay some of their homeworkers the applicable minimum wage.

■ While it is possible, and even probable, that a few of the homeworkers occasionally worked in excess of 40 hours per week, there is no credible evidence to show when this occurred, or the homeworkers involved. Consequently, a violation of Section 7 of the Act, requiring payment of not less than one and one-half times the regular rate for hours of work over 40 per week, has not been shown.

■ The uncontradicted evidence clearly shows that the defendants repeatedly violated Section 11(c) of the Act and Regulation 516 (29 C.F.R. 516) by failing to make, keep and preserve an accurate record of the hours worked per day and per week by their homeworkers. This is an obligation imposed by law upon the defendants, not their employees, and defendants cannot be relieved of their statutory obligation by relying upon the information recorded in the handbooks, particularly when they knew, or had reason to believe, the information was inaccurate. Caserta v. Home Lines Agency, Inc., 2 Cir., 273 F.2d 943 (1959). By requiring homeworkers to meet minimum production schedules as a condition of further employment, the defendants indirectly encouraged homeworkers to maintain inaccurate records.

■ The public interest requires employers that have violated the Act over a period of time to be enjoined against repeating such violations in the future, whether the violations have lessened, or even ceased. The purpose of an injunction against future violations is remedial, not punitive, and is the most effective way available to protect employees and the public. McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L. Ed. 599 (1949). Since an injunction creates no obligation not imposed by law, no undue burden is placed on an employer by its issuance. Mitchell v. Lublin, McGaughey and Associates, 358 U. S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). In this case, the defendants were not ignorant of the requirements of the law, having previously been investigated on at least three occasions and informed of the requirements of the Act. On each occasion, they promised to comply in the future. Having failed to comply, an injunction restraining future violations is clearly warranted.

There remains the difficult question of computing the amount of unpaid minimum wages due the seven employees who testified at the trial. The plaintiff contends that unpaid minimum wages should be awarded, even though the amount is merely a reasonable approximation, when a violation of the Act has been shown. The defendants, on the other hand, contend that no awards are justified for the reason that they would necessarily have to be based upon speculation, averages and opinions of employees made up from uncertain recollections. After mature consideration, the Court is of the opinion that the landmark case of Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), justifies an award to each of the seven homeworkers, "even though the result be only approximate." In *Anderson*,

at pages 686, 687 and 688, 66 S.Ct. at page 1192, the court stated:

"An employee who brings suit under § 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof.

When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. See Note, 43 Col.L.Rev. 355.

The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or nonactivities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.' Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563 [51 S.Ct. 248, 250, 75 L.Ed. 544]. It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages."

Unpaid minimum wages have also been ordered, even though the amounts were approximate, in Handler v. Thrasher, 10 Cir., 191 F.2d 120 (1951); Mitchell v. Caldwell, 10 Cir., 249 F.2d 10 (1957); Crawford Production Company v. Bearden, 10 Cir., 272 F.2d 100 (1959); Mitchell v. Mitchell Truck Lines, Inc., 5 Cir., 286 F.2d 721 (1961); Mitchell v. Riley, 5 Cir., 296 F.2d 614 (1961); Wirtz v. Dix Box Co., 9 Cir., 322 F.2d 499 (1963); and Wirtz v. McClure, 10 Cir., 333 F.2d 45 (1964). In each of these cases, the court followed the principles of law enunciated by the Supreme Court in the *Anderson* case.

■■■■■ It must be conceded that the testimony of the seven homeworkers was extremely vague and indefinite in many respects, and their estimates of production and hours worked were based on averages and opinions made up from recollections of events that occurred two or three years earlier. This makes it extremely difficult to determine, with any reasonable accuracy, the amount of wages due a particular homeworker. Nevertheless, an employee who has carried his burden of showing that he has in fact performed work for which he was improperly compensated, is entitled to an award "if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." If an employer fails to produce evidence to negative the reasonableness of the inference, the court may "award damages to the employee even though the result be only approximate." The homeworkers involved have clearly demonstrated that they performed work for the defendants for which they were not properly compensated. Since the defendants failed to come forward with evidence as to the precise amount of the hourly production of their homeworkers, the court has, as matter of just and reasonable inference, from the testimony of each of the seven homeworkers, approximated their hourly production of certain items.

The hourly productions of the seven homeworkers who testified at the trial, as found by the Court, together with the information recorded in the various handbooks, which has been found to be accurate, provide a method whereby the amount of unpaid minimum wages due each of said employees can be mathematically determined. If the parties are unable to agree on the computations, same will be made by the Court and included in the final judgment to be entered after a determination has been made of the amount of unpaid minimum wages, if any, due the other homeworkers named in the complaint.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The defendants have repeatedly violated Section 6 (minimum wages) and Section 11(c) (record keeping) provisions of the Act.

3. The evidence fails to establish that any of the homeworker employees worked in excess of 40 hours per week during the period of their employment.

4. An injunction should issue enjoining and restraining the defendants from future violations of the Act.

5. An injunction should issue enjoining and restraining the defendants from withholding the unpaid minimum wages due the seven homeworkers who testified at the trial, and the unpaid minimum wages, if any, due the other homeworkers named in the complaint, the exact amounts of which will later be computed and included in the final judgment.

The Clerk is being instructed to notify counsel for the plaintiff and the defendants to appear before the Court in Greensboro on July 22, 1966, for a conference regarding the procedure to be followed in determining the unpaid minimum wages, if any, due the remaining homeworkers named in the complaint.