W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

ATLAS ROOFING MANUFACTURING COMPANY, Inc., Appellee.

No. 23184.

United States Court of Appeals
Fifth Circuit.

May 12, 1967.

Bessie Margolin, Assoc. Sol., Dept. of Labor, Edward D. Friedman, Atty., Dept. of Labor, Charles Donahue, Sol. of Labor, Robert E. Nagle, William Fauver, Attys., Washington, D. C., Beverley R. Worrell, Regional Atty., for appellant.

J. Stuart Robinson, Jackson, Miss., for appellee.

Before GEWIN, THORNBERRY and DYER, Circuit Judges.

GEWIN, Circuit Judge:

W. Willard Wirtz, Secretary of Labor, brought an action in the United States District Court for the Southern District of Mississippi under § 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, to permanently enjoin Atlas Roofing Manufacturing Company, Inc. (Atlas) from violating § 15(a) (2), (3) and (5) of the Act, 29 U.S.C. § 215(a) (2), (3) and (5), and to restrain Atlas from withholding payment of unpaid minimum wages and overtime compensation due certain of its employees. The district court granted an injunction limited to one year rather than the permanent re-

lief prayed for in the complaint and ordered Atlas to demonstrate to the court within the year its compliance with the Act and show cause why the injunction should not be extended for another year. The Secretary appeals from the denial of a permanent injunction.

Atlas, a Mississippi corporation, having its place of business in Meridian, Mississippi, is engaged in the production, sale and distribution of roofing materials. Substantial quantities of roofing materials are being regularly sold, shipped and delivered by Atlas employees to points outside the State of Mississippi. Other Atlas employees guard and protect its property and production facility and control the movement of vehicles and persons into and out of Atlas' premises. Atlas' employees by reason of their activities just mentioned are engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act.[1]

Atlas has been the subject of several investigations by a Department of Labor wage and hour investigator whose job was to determine compliance under the Fair Labor Standards Act. The first investigation covered the period January 1961 to 1963 and disclosed violations of the Act's overtime provisions and record keeping provisions as to the asphalt truck drivers and Atlas was so informed.

In July 1963, after a § 16(c)[2] request was filed by Atlas employees, the asphalt drivers, for the Secretary of Labor to file suit for collection of back wages, the investigator made his second trip to Atlas. The investigator discovered that the violations which existed in January 1963 had not been corrected. Consequently, on October 31, 1963, the Secretary filed suit in the United States District Court for the Southern District of Mississippi alleging that Atlas had violated the overtime provisions and record keeping provisions of the Act[3] and withheld payment of overtime compensation due four asphalt truck drivers for the period November 1, 1961, to July 8, 1963. The Secretary prayed that Atlas be permanently enjoined from violating the provisions of the Act. A stipulation for dismissal was filed by the parties on February 27, 1964, in which Atlas (1) acknowledged its prior violations; (2) agreed to pay the back wages due its employees; (3) represented that it had come into compliance with the Act; and (4) gave full assurance that it would comply in the future. Thereupon the court dismissed the Secretary's complaint with prejudice.

However, on the third investigation, April 1964, it was discovered that accurate records were still not being maintained on the asphalt drivers and that Atlas had not paid two of its asphalt truckers overtime for the period from July 1963 to October 1963. Atlas had paid the back wages due for overtime work to July 1963 as claimed by the asphalt drivers in the initial suit. Nevertheless, this third investigation revealed that while Atlas paid back wages for overtime due its truckers to July 1963 as it had stipulated it would, Atlas had continued to work its asphalt drivers in the same manner until October 1, 1963, and had thereby worked two of them overtime during the period July to October, 1963, for which no additional compensa-

---

1. Atlas has twice stipulated to this fact. The first occasion was in the stipulation for dismissal filed February 27, 1964, of an action filed by the Secretary on October 31, 1963, against Atlas for violation of the Act, and the second occasion was before trial in the instant case.

2. Fair Labor Standards Act, § 16(c), 29 U.S.C. § 216(c) provides in part:

"When a written request is filed by any employee with the Secretary of Labor claiming unpaid minimum wages or unpaid overtime compensation under section 206 or section 207 of this title, the Secretary of Labor may bring an action in any court of competent jurisdiction to recover the amount of such claim:"

3. See 29 U.S.C. §§ 207, 211, and 215(2) and (5).

tion had been paid.[4] Also it was discovered that Atlas had violated the minimum wage, overtime and record keeping provisions as to its plant guards. Consequently, the Secretary brought suit in the United States District Court for the Southern District of Mississippi alleging that Atlas had violated the minimum wage, overtime and record keeping provisions and that these violations had resulted in the unlawful withholding of unpaid back wages totaling $616.88 due the plant guards and the two asphalt drivers.[5] The Secretary prayed that Atlas be enjoined from withholding compensation due its employees and that it be permanently enjoined from violating the aforementioned provisions.

Before trial Atlas stipulated that during the periods of time covered by this suit it violated the minimum wage and overtime provisions of the Act. It also stipulated that it had violated the record keeping requirement of the Act as to the plant guards. The Secretary stipulated that Atlas had paid the back wages and overtime compensation due its employees as specified in the complaint.

According to the testimony given at the trial, Atlas had, by the time of trial, May 1965, rectified its errors and was in full compliance with the Act. It had paid the back wages and overtime compensation due as stipulated above. Around November 1, 1964, Atlas had begun maintaining records of the hours worked by the plant guards by implementation of a time card procedure. The plant guards' working hours were reduced to 40 hours a week in order to comply with the minimum wage provisions and for any hours worked over 40 Atlas had paid overtime. Records were also being kept on the truck drivers which reflected the number of hours worked.[6] Much of the testimony at trial dealt with whether Atlas had paid its truckers the minimum wage.[7]

The Secretary contends that in view of Atlas' persistent violations continuing after repeated administrative efforts to effect voluntary compliance, it was an abuse of discretion to deny a permanent injunction against further violations of the Act. Atlas insists that its violations were unintentional, that it has not acted

---

4. After October 1, 1963 the asphalt drivers were no longer entitled to overtime due to the fact that Atlas had implemented a pooling arrangement with the road drivers as well as the asphalt drivers in order that all drivers would be given interstate trips and thereby come under the Act's § 13(b) (1) overtime exemption.

5. The Secretary also alleged that Atlas had unlawfully discharged one Earl Burns in violation of § 15(a) (3), 29 U.S.C. § 215(a) (3) in that he was fired because he had previously filed a complaint under the Act and had caused to be instituted a proceeding under the Act against Atlas. The Secretary sought to require Atlas to offer reinstatement to Burns and to reimburse him for lost wages. At the beginning of trial Atlas agreed to pay Burns in reimbursement of lost wages occurring as a result of his discharge the sum of $1,000. Atlas having offered reinstatement and having been advised that Burns did not desire to be reinstated, further agreed to pay $100 in lieu thereof. Therefore, the Secretary dismissed that part of his complaint regarding the discharged employee Burns.

6. The drivers were paid at the rate of five cents per mile. It was testified that the mileage was obtained from various sources, a Rand-McNally Road Atlas, the ICC log mile book and hub meter and speedometer readings. Therefore, truck driver wages were not paid in relation to the number of hours worked and consequently accurate records of their working time were not kept. Although each individual driver kept a log book which showed the number of hours he spent driving, on duty but not driving, and off duty, these records were not kept on a daily basis and were not turned over to Atlas in any regular fashion. However, at least a month before trial, Atlas had instituted the procedure of demanding that the logs be turned in before it would distribute paychecks to the drivers. As a consequence Atlas was maintaining up-to-date records of the hours worked by their employee truck drivers.

7. The trial court stated:
"The principal trouble with the employer remaining in this case is as to its record-keeping requirements, minimum wage and overtime pay of its truck drivers."

in bad faith and that since by the time of trial it had fully complied with the Act, a permanent injunction is not warranted.

■■ Whether an employer should be enjoined from violating the Fair Labor Standards Act lies within the sound judicial discretion of the trial court. Two factors which should be considered in determining whether an injunction should issue are the employer's previous actions of non-compliance and the dependability of its promises for future compliance. Goldberg v. Cockrell, et al., 303 F.2d 811 (5 Cir. 1962); Mitchell v. Hausman, 261 F.2d 778 (5 Cir. 1958).

■ Since the purpose of the injunction is to prevent future violations, Buckley, et al. v. Wirtz, 326 F.2d 838 (10 Cir. 1964); Wirtz v. Ti Ti Peat Humus Co., Inc., 249 F.Supp. 166 (S.C.1966), the court's conclusion that the employer will hereafter comply with the provisions of the Act is of paramount importance. In fact the finding by the court that there is no indication that future violations will occur is often a decisive factor in the court's decision to refuse to grant an injunction. United States v. W. T. Grant Co., et al., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Durkin v. Lovknit Mfg. Co., Inc., 208 F.2d 665 (5 Cir. 1953); Walling v. Shenandoah-Dives Mining Co., 134 F.2d 395 (10 Cir. 1943).

■ The record before us details Atlas' repeated violations. Atlas has consistently refused since the first investigation until the time for trial in the instant case to maintain accurate records of its truck drivers. It has taken the filing of two suits to compel Atlas to keep proper records and to cease withholding back wages due certain of its employees. On three different occasions Atlas was advised by the wage and hour investigator that its operations ran afoul of the Act and Atlas either did nothing or waited until additional pressure was brought to bear in the form of a legal action. Admittedly, the number of employees involved during the several investigations covering more than three years is small,

11 out of approximately 141, as is the amount of back wages found to have been withheld during this period, $1,737.19. Atlas uses these figures to diminish the importance of its violations. However, these figures also negate any reasonable explanation, such as complexity of operations involved or the need to have entire plant procedure overhauled, as to why it took Atlas so long to mend its ways after being informed of its illegal practices. For instance, as the facts indicate nothing was done to correct the situation after the first investigation. After the second investigation and the filing of the first suit, and after Atlas promised to comply with the Act, the violations were only partially remedied. The third investigation disclosed old and new violations. With respect to the fact that Atlas had once promised to comply in the future and such promise was not kept, we wish to point out that it has been held that where an employer has stipulated that it would abide by the Act and then continued to violate the provisions of the Act, an injunction is proper. Gatlin v. Mitchell, 287 F.2d 76 (5 Cir. 1961), cert. den. 366 U.S. 963, 81 S.Ct. 1925, 6 L.Ed.2d 1255; Wirtz v. Office Communication Co., et al., 244 F.Supp. 994 (M.D.N.C.1965).

■ From this background of repeated violations we must determine if there is a danger of recurrent violations which would necessitate the issuance of a permanent injunction. The past activities of Atlas speak for themselves even though it was in full compliance with the Act at the time of trial. It has been held that the mere fact that the employer remedied its illegal practices before trial does not prevent the issuance of an injunction. Wirtz v. Hardin & Co., Inc., et al., 253 F.Supp. 579 (N.D.Ala.1964) aff'd. 359 F.2d 792 (5 Cir. 1966); Wirtz v. Ocala Gas Co., Inc., et al., 336 F.2d 236 (5 Cir. 1964); Wirtz v. Young Electric Sig. Co., 315 F.2d 326 (10 Cir. 1963); Wirtz v. Carolina Co., Inc., et al., 255 F.Supp. 417 (M.D.N.C.1966). This is especially true where compliance is delayed until "the imminence of legal

compulsion made it inevitable." [8] Opelika Royal Crown Bottling Co., et al. v. Goldberg, 299 F.2d 47, 44 (5 Cir. 1962). The reason why current compliance with the Act does not bar injunctive relief is obvious. The question of whether there is a likelihood that violations will be resumed is still present.

Atlas' attitude towards the Act and especially its attitude toward its responsibility to see that its operations comply with the Act were amply demonstrated at the trial. Mr. Richard G. Sessions, general manager of Atlas, testified in the following manner in response to questions concerning the first suit brought against Atlas:

"Q. You do remember that suit that particular action being filed against Atlas Roofing do you not, Mr. Sessions?

"A. Would you repeat that again please, sir?

"Q. You do recall the suit being filed on the date that I have just mentioned against Atlas Roofing Manufacturing Company the first suit filed?

"A. Specifically what was that in regard to?

"Q. Compliance with the fair labor standards act, Mr. Sessions?

"A. (No answer.)

"Q. As to asphalt truck drivers, Mr. Sessions?

"A. I do believe I remember that, yes sir.

"A. Just vaguely?

"By the Court: It must not have made much impression on him. Ask him something else."

Mr. Wade Simmons, office manager of Atlas, gave the following testimony in regard to his knowledge of the Act: [9]

"Q. How much time have you spent in studying the uh fair labor standards act, Mr. Simmons?

"A. Well, not an awful lot.

"Q. Aren't you the man who is charged with this for example?

"A. I try to comply, yes.

"Q. Aren't you the man at the company whose job it is to make certain that the record keeping provisions of this law are being complied with?

"A. That's right.

"Q. Have you ever read the record keeping regulations?

"A. No, I haven't.

"Q. Have you ever read the overtime uh?

"A. I think I am familiar with it."

In fact the trial judge stated in his opinion: "At one time the employer was not in compliance with the act with respect to plant guards and was advised thereof in April 1962 [sic] [evidently 1964] but compliance with the act as to the guards was not accomplished until November of that year, revealing a *surprising indifference* as to their obligation under that statute." (Emphasis added)

■ Therefore, in view of Atlas' past violations, the length of time it took Atlas to comply with the Act and its demonstrated indifference towards its responsibility, the likelihood of future violations is quite possible. Thus, we find that the Secretary is entitled to a permanent injunction.

■ The injunction has a beneficial effect administratively in enforcing the Act.

"The Wage and Hour Division cannot reasonably be charged with the

---

8. With respect to Atlas the district court observed:

"Compliance with this act is accomplished only when it is discovered by investigation and pin-pointed by a representative of the Secretary."

9. Various departmental bulletins had been given Atlas in January 1963 such as the compensable time or hours worked bulletin, an overtime bulletin and one which outlines the requirements of the overtime exemptions of truck drivers as well as the regulations which contain the applicable information that an employer must maintain under the Act.

responsibility of checking back on past violators to make sure that they are obeying the laws. Fairness and economy of administrative effort both dictate that after an employer has once violated the Act he should bear his own responsibility for the future."

Goldberg v. Cockrell, et al., 303 F.2d 811, 814 (5 Cir. 1962). The importance of administrative efficiency has grown in light of the recent amendments to the Fair Labor Standards Act. For example, Section 3(s) (1), 29 U.S.C. § 203(s) (1), as amended September 23, 1966, Pub.L. 89–601, 80 S.Ct. 830 has enlarged the Act's coverage by lowering the minimum gross annual volume test from $1,000,000 to $500,000 for the period from February 1, 1967, through January 31, 1969, and to $250,000 for the period after January 31, 1969, for all enterprises having employees engaged in commerce or in the production of goods for commerce. This amendment will increase the burden of the wage and hour investigators. In order to effectuate the policy of Congress and aid the administrative effort. at enforcement of this policy, the injunction is a necessary tool.[10]

 Even though "the granting or denial of an injunction—and perhaps of greater importance, the delicate drafting of its terms—must inevitably be left initially to the sound discretion of the District Judge," Mitchell v. Hodges Contracting Co., et al., 238 F.2d 380, 381 (5 Cir. 1956), the facts in this case warrant nothing less than a permanent injunction.

---

10. In Wirtz v. Graham Transfer & Storage Company, 322 F.2d 650 (5 Cir. 1963) this Court observed:
   " * * * The Act covers 30 million employees and over a million businesses. If a practice were made of vacating an injunction on a defendant's promise to be good, enforcement of the Act would be weakened and an undue burden of repeated investigation would be placed on enforcement officials, eventually increasing the burden on the courts."

The order of the district court is vacated and the case is remanded with instructions that the district court grant the injunction as prayed for by the Secretary.

Vacated and remanded.

---

The district court made the following observation in its letter opinion in the instant case:
   "But this is an act of Congress which must be respected whether anybody likes it or not and compliance cannot be compelled by the Secretary if he must give the same amount of personal attention to every employer which he has been obliged to give this employer to get him to comply with this act."